UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DAVID SMITHERS,

        Petitioner,

            v.                      CAUSE NO. 3:18-CV-1033-JD-MGG

WARDEN,

        Respondent.

OPINION AND ORDER

David Smithers, a prisoner without a lawyer, filed a habeas corpus petition

under 28 U.S.C. § 2254 to challenge his conviction for conspiracy to commit murder

under Case No. 41D03-12-CF-194. Following a guilty plea, on February 5, 2003, the

Johnson Superior Court sentenced him to fifty years of incarceration. On January 27,

2020, the court appointed counsel for Smithers. ECF 21.

BACKGROUND

On direct appeal, the Indiana Court of Appeals summarized the facts of the

crime and trial court proceedings as follows:

> Between November 24 and 27, 2000, Smithers was babysitting for five-
> year-old S.M. and made her watch a pornographic movie. During that
> same time period, Smithers also pulled down his pants, put his penis in
> S.M.'s mouth, rubbed his penis on S.M.'s buttocks, and touched S.M.'s
> vaginal area. Thereafter, the State charged Smithers with Count I, child
> molesting as a class A felony; Count II, child molesting as a class C felony;
> Count III, child molesting as a class C felony; and Count IV, dissemination
> of matter harmful to minors as a class D felony in cause number 41D03–

0012–CF–194 ("Cause # 194").[1] The State also filed a motion for a protective order on behalf of S.M., and the trial court granted it.

Around August 27, 2001, while Smithers was incarcerated in the Johnson County Jail on the charges in Cause # 194, he entered into an agreement with fellow inmate, Codell Wombles, for Wombles to murder S.M. Smithers drew a map showing where S.M. lived and gave it to Wombles, described S.M.'s appearance to Wombles, and gave Wombles some money. On August 31, 2001, the State charged Smithers with conspiracy to commit murder as a class A felony under cause number 41D03–0108–CF– 126 ("Cause # 126").

On November 20, 2002, Smithers entered into a plea agreement with the State on Cause # 126. Smithers agreed to plead guilty as charged, and the State agreed to open sentencing by the trial court. That same day, the trial court held a hearing, and Smithers pleaded guilty to conspiracy to commit murder as a class A felony.

On December 5, 2002, Smithers entered into a plea agreement with the State on Cause # 194. Smithers agreed to plead guilty to Count I, child molesting amended to a class B felony, and to Counts II, III, and IV as charged, and the State agreed to make the following sentencing recommendations: (1) open sentencing on all counts; (2) sentences on Counts I through IV be served concurrently to each other; and (3) the sentence imposed be served consecutively to the sentence in Cause # 126. That same day, the trial court held a hearing, and Smithers pleaded guilty to the three child molesting charges and the dissemination of matter harmful to minors charge.

\* \* \*

The trial court then sentenced Smithers to fifty years on his class A felony conspiracy to commit murder conviction in Cause # 126. In Cause # 194, the trial court sentenced Smithers to twenty years with two years suspended on his class B felony child molesting conviction, eight years on

---

[1] As detailed in this section, the child molestation conviction is factually and procedurally intertwined with the conspiracy to commit murder conviction. The conspiracy to commit murder occurred against the backdrop of the pretrial proceedings for the child molestation conviction and targeted the child victim. The prosecution filed charges in separate cases, and Smithers entered his guilty pleas separately, but Smithers received a single sentencing hearing and direct appeal process for both cases. Nevertheless, Smithers' filings indicate that he solely challenges the conspiracy to commit murder conviction in this federal habeas case, and the court accepts this formulation. The legal analysis would not change regardless.

> each of his class C felony child molesting convictions, and three years on
> his class D felony conviction. Then, pursuant to the plea agreement, the
> trial court ordered that the four counts in Cause # 194 be served
> concurrently to one another and that that sentence be served
> consecutively to the sentence in Cause # 126, for a total sentence of
> seventy years. Thereafter, the trial court ordered that Smithers serve a
> sixty-eight year executed sentence in the Indiana Department of
> Correction and two years suspended.

ECF 11-4 at 2-7; *Smithers v. State*, 858 N.E.2d 695 (Ind. App. 2006).

On December 12, 2006, the Court of Appeals of Indiana affirmed the sentence on

direct appeal, and Smithers did not file a petition to transfer to the Indiana Supreme

Court. ECF 11-1 at 4. On June 16, 2011, Smithers initiated post-conviction proceedings in

the Johnson Superior Court, but the court summarily denied the petition. PCR App. 24-

29, 53-55. On November 10, 2011, he initiated an appeal, which culminated in the denial

of a petition to transfer to the Indiana Supreme Court on December 7, 2012. ECF 11-5 at

1, 6.

On December 27, 2018, Smithers filed the petition initiating this habeas case. In

the petition, Smithers asserted that he was entitled to habeas relief because the

prosecution withheld material evidence regarding an informant and because his guilty

plea was involuntary due to the conditions of his confinement in segregation at the

Johnson County Jail. Smithers further asserted that his guilty plea was involuntary

because the prosecution threatened to file additional charges against him that would

not have been successful and that his trial counsel was ineffective for not advising him

of the futility of that threat.

3

On July 28, 2021, the court entered an order finding that the claims regarding undisclosed evidence, ineffective assistance of trial counsel, and prosecutorial threats were without merit. ECF 47. With respect to the remaining claim that the guilty plea was involuntary due to the conditions at the Johnson County Jail, the court found that it was untimely, procedurally defaulted, and that the evidentiary record as it stood was insufficient to support the underlying claim. *Id.* Smithers, however, argued that the court should excuse the untimely nature of his claim under the equitable tolling doctrine because his mental condition prevented him from filing a habeas petition sooner. He also argued that the court should excuse the procedural default because the conditions at the Johnson County Jail caused him to develop a mental condition that prevented him from presenting the underlying claim on post-conviction review. The court observed the substantial factual overlap between Smithers' procedural arguments and underlying claim. The court also noted that the record lacked sufficient evidence to find in Smithers' favor and that Smithers had not filed an appropriate motion for an evidentiary hearing.

On October 6, 2021, the court granted Smithers' motion for an evidentiary hearing. ECF 50. Smithers indicated that, at an evidentiary hearing, he would present evidence pertaining to his mental condition throughout his incarceration and pertaining to the conditions of the Johnson County Jail during his pretrial detainment. ECF 48. The court found that Smithers had satisfied the requirement set forth in *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), which required the court to "consider whether such a hearing

could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."

## EVIDENTIARY HEARING

Following a lengthy discovery period, the court held the evidentiary hearing on August 14, 2023, and on August 15, 2023, and heard testimony from Smithers, Dr. Jeffrey Burnett, Fernando Griffith, Prosecutor Welliver, and Sergeant Bartlett ECF 97, ECF 99, ECF 100.

### Smithers' Testimony

At the hearing, Smithers testified that when he first arrived at the Johnson County Jail, it was undergoing construction, and he spent two years there. He was placed in the dayroom of the segregation unit, D block, until booking, which he referred to as the "drunk tank." He moved to a cell upstairs from the dayroom where he lived for nine months. The cell measured six feet by nine feet and was empty except for a bed, toilet, and a sink. It had feces stuck in the vents, and he could not clean it. He did not have access to radio, television, or books, and he was not allowed to talk to others, though he would violate this rule. In this cell, he did little more than pace, talk to himself, and consider his criminal charges. He received meals through the cuff port. Daily or every other day, he took showers and went into the dayroom for recreation. He could receive one visit from family members per week, though they visited him less often as time passed. He could see outside his cell where he saw officers at the shooting range using cutouts of inmates as targets and the area where animal control performed

euthanasia. He lost his grip on reality and was mentally "gone" after nine months. He asked for mental health care, and medical staff prescribed trazodone but otherwise appeared unsympathetic.

Smithers testified that, after nine months, he was placed in general population. For eleven days, he shared a cell with Cody Wombles. He found Wombles to be disturbing as he paced and discussed grand conspiracies. Wombles would get indignant if Smithers did not participate in conversations about various schemes. Based on his conversations with Wombles, he was charged with conspiracy to commit murder and was moved to another segregation unit, HD Unit.

The HD block was in the newly constructed booking area. There, the lights were always on, it was always noisy, and he had no access to media. Correctional staff occasionally moved him to other blocks for a few days at a time, where he would have access to commissary, books, and television, but he generally remained in HD unit until he plead guilty.

Smithers testified about his recollection of a fellow detainee named McTarsney. One night, he saw officers bring McTarsney into the jail as he fought against them. Officers took him into a segregation cell with his hands cuffed behind his back, stayed for a couple of minutes, and then left. At breakfast, an officer found McTarsney in his cell and radioed for medical assistance. Correctional staff indicated that he had died by hanging, but when they removed McTarsney from his cell, Smithers saw his hands still handcuffed behind his back and knew that the bunks were only eighteen inches from

the floor. He did not believe that McTarsney had died by hanging but was persuaded to plead guilty because he did not want to spend another day at the Johnson County Jail.

Prior to accepting the guilty plea, trial counsel told him that he would not receive a trial for two more years. At that point, Smithers was a "mentally numb robot." Trial counsel also told him that he could be removed from the jail if he plead guilty. Other inmates told him that conditions were better at the facilities maintained by the Indiana Department of Correction.

He went to the Reception Diagnostic Center, then to Wabash Valley Correctional Facility, then to Pendleton Correctional Facility, and then to the Indiana State Prison. He tended to stay by himself and avoided speaking to others. He suffered panic attacks caused by exposure to legal materials and had no ability to discuss his criminal cases. He sought mental health care in his first years but did not find it helpful because they provided only medication and did not provide counseling. He suffered anxiety and panic attacks and received a diagnosis for post-traumatic stress disorder. He reinitiated mental health care when therapists arrived at the prison and he was placed in disciplinary segregation, where he was automatically assigned a therapist. He was able to discuss the jail conditions and found counseling very helpful. He also received new medication for post-traumatic stress syndrome, which he finds very helpful. He is now able to discuss the jail conditions without a panic attack.

At the Pendleton Correctional Facility, Ernie Tope, a fellow inmate, helped him file a post-conviction petition. He told Tope as much as he could, including the circumstances surrounding the conspiracy to commit murder charge. A few months

after receiving some counseling, he spoke with a fellow inmate named Garfield regarding the jail conditions, and he helped Smithers prepare the habeas petition.

On cross-examination, defense counsel presented him with a jail record indicating that, on December 22, 2000, Smithers submitted a request to be placed in administrative segregation due to the nature of his criminal charge. Hearing Ex. C at 57. Smithers verified his signature on the form but testified that he did not recall submitting this request and that he did not know what administrative segregation was at that time. In D block, correctional staff occasionally placed another detainee in his cell, but he was alone ninety percent of the time. He verified other jail records, including law library requests and grievances. He had some telephone privileges but was granted access inconsistently and only in the early morning. He was placed in lockdown for three days while on D block for threatening another detainee, but lockdown conditions were substantially similar to ordinary conditions. He discussed the jail conditions with trial counsel, but trial counsel told him he could not help. He was stabbed in the chest by the child molestation victim's father shortly before his arrest, which may have contributed to his mental trauma.

Smithers further testified that, in April 2003, he filed a federal lawsuit regarding the jail law library and mental health care with the assistance of another inmate. He copied his complaint from a prior federal lawsuit in 2001, which was dismissed for failure to prosecute because Smithers did not have access to the law library. On post-conviction review, he challenged his guilty plea, arguing that the prosecutors threatened to initiate additional criminal charges against him. He discussed the jail

8

conditions for the first time with a mental health counselor in 2018. He intended to appeal the denial of post-conviction relief, but a lengthy lockdown prevented him from doing so.

In rebuttal, Smithers testified to clarify a jail record in which he complained that he had subscribed to a newspaper but had stopped receiving it, which implied that he otherwise had access to newspapers. He testified that a family member purchased the subscription for him and that he received only one newspaper pursuant to that subscription at the county jail.

<u>Expert Testimony & Report</u>

Smithers presented Jeffrey W. Burnett, Ph.D., ABPP, as an expert witness on forensic psychology in addition to Dr. Burnett's report, and his testimony was largely consistent with his report. According to the report (Hearing Ex. 1), Dr. Burnett reviewed about six thousand pages of records, including court filings, hearing transcripts, records from the Johnson County Jail, and records from the Indiana Department of Correction. He also interviewed Smithers and trial counsel, and an investigator interviewed Fernando Griffith, Smithers' fellow detainee at the Johnson County Jail.

Dr. Burnett first sought to ascertain the conditions of confinement at the Johnson County Jail but observed that the incomplete jail records made this task difficult.[2] He meticulously recounted the records available to him. He observed that Smithers spent some time in segregation and some time with greater privileges, including access to

---

[2] The parties submitted Smithers' jail records as an exhibit to this evidentiary hearing. The court will describe these records in greater detail within the discussion section.

media and other inmates, but he could not determine how much time Smithers spent under each set of conditions.

Dr. Burnett next sought to determine the impact of the jail conditions on Smithers' mental health, relying on medical records from the jail and the Indiana Department of Correction, a mental health evaluation in August 2002, and the presentence investigation report. He observed that Smithers wrote a variety of cogently written documents, including some very detailed and some with citations to page numbers or quoted passages.

In reviewing the medical records,[3] Dr. Burnett observed that Smithers took antidepressant medication and Trazodone for insomnia at the jail. The presentence investigation report, dated October 2001, stated, "The Defendant claims his mental health is not good," due to "him being locked up" on criminal charges. In August 2002, Smithers moved for a mental health evaluation, and, on August 16, 2002, a clinical nurse specialist prepared a mental health report. Hearing Ex. C at 61-62. In the 2002 report, Smithers complained of anxiety, anger issues, seeing shadows, and suicidal thoughts. The clinical nurse specialist observed fidgeting, poor eye contact, and anxiety. She diagnosed anxiety disorder and antisocial personality disorder, and she recommended that he be continued on Zyprexa, an antipsychotic sedative, and Trazodone. According to Dr. Burnett's interview with trial counsel, Smithers appeared to be consistently

---

[3] The parties submitted into evidence the material medical records upon which Dr. Burnett relies. Hearing Ex. K. The court has independently verified that the medical records are as Dr. Burnett described them.

oriented, aware, and cogent when trial counsel met or worked with him and that Smithers seemed depressed in the typical manner of criminal defendants facing long sentences.

According to Dr. Burnett's report, a psychologist met with Smithers shortly after he transferred into the custody of the Indiana Department of Correction. The psychologist observed mild paranoia, racing thoughts, anxiety, and depression and referred him to a psychiatrist for a medication evaluation. The psychiatrist diagnosed bipolar disorder and prescribed trazodone and Trilafon, an antipsychotic used to treat anxiety, agitation, psychosis, and mania. Hearing Ex. K at 106-07. Three months later, Smithers reported the same symptoms and described himself as a "nervous wreck" and as on an "emotional roller coaster." *Id.* at 104-05. The psychiatrist replaced Trilafon with Risperdal, another antipsychotic.

During the next five years, Smithers continued to see mental health professionals. During this time, he reported difficulty sleeping, chronic anxiety, racing thoughts, panic attacks, cold sweats, and flashbacks to his time in the Johnson County Jail. Mental health professionals continued to diagnose bipolar disorder and added a diagnosis of post-traumatic stress disorder, and they prescribed various antipsychotics, antidepressants, and bipolar disorder medications. Around 2007, Smithers became demoralized and stopped seeking mental health treatment, and, by March 2010, his classification had changed to "free of mental illness." Hearing Ex. K at 56-57, 63-64, 66-68, 73, 81-94. Smithers received one or two mental therapy sessions while in restrictive housing in 2016 and 2018. In 2019, a psychologist reinstated the post-traumatic stress

disorder diagnosis and changed his classification accordingly. *Id.* at 46-47. His medical records from 2019 indicate that Smithers continues to report anxiety, panic attacks, racing thoughts, hearing voices, difficult sleeping, and paranoia.

Dr. Burnett assessed Smithers using a Clinician Administered PTSD Scale for DSM-IV (CAPS-4). Smithers represented that loud noises that are typical in prison triggered intrusive flashbacks to his time in county jail. Based on his responses, Smithers satisfied the diagnostic criteria for post-traumatic stress disorder, though Dr. Burnett noted a contrast between the reported symptoms and Smithers' description of prison life as stiflingly boring with little to do. Dr. Burnett noted that Smithers' lack of detail regarding his time at the county jail but also noted that PTSD patients commonly exhibit the avoidance of thoughts and feelings related to trauma. He further observed that some medical professionals showed skepticism towards Smithers' reported mental symptoms, noting vagueness and lack of objective signs or that he appeared to be seeking a particular type of drug or evidence for a lawsuit.

Dr. Burnett observed Smithers' efforts to challenge his convictions in appellate and post-conviction proceedings in six separate instances from 2003 to 2012. He further observed that, with the Indiana Department of Correction, Smithers submitted multiple letters, requests, and grievances every year on topics such as visitation, medical care, religion, and access to music and television channels. He noted that Smithers wrote in a detailed manner with citations to policies and with persistence in back-and-forth communication with correctional staff. Smithers has also engaged in correctional

programs by teaching music lessons, leading worship services, completing parenting programs, and taking college courses.

Dr. Burnett subjected Smithers to a number of tests. The Validity Indicator Profile indicated that Smithers was not feigning low intelligence. The Wechsler Adult Intelligence Scale indicated that he had superior intellectual functioning. The Gudjonsson Suggestibility Scales indicated that he is average with respect to his degree of suggestibility. Dr. Burnett also administered the MMPI-2RF, which he described as follows:

> Mr. Smithers completed the MMPI-2Rf, a 338-item, true-false, self-report test of personality and psychopathology. He answered all items and did so with good consistency, suggesting he likely understood the item content and provided intentional responses. An extremely high score on one validity scale indicates he endorsed an unusually large number of problems and symptoms that are infrequently endorsed by individuals with known severe psychological difficulties who report credible symptoms assessed by that scale and do not accurately reflect his true psychological functioning. Mr. Smithers's score on this scale is significantly elevated even in comparison to other prison inmates who on average report more psychological problems or symptoms than most people, and is in fact so high that the profile is invalid, and interpretation of the clinical scales is not advised.

Dr. Burnett observed the medical consensus that solitary confinement can affect mental health, particularly when imposed for lengthy periods of time and on mentally ill individuals. He found that Smithers spent "what appears to have been" lengthy periods of time in isolation at the county jail and that "seemingly" as a result of solitary confinement, he developed serious and persisting mental health symptoms. Dr. Burnett concluded that "the conditions of confinement during Mr. Smithers's pretrial confinement did seriously damage his mental health."

13

Dr. Burnett next considered whether Smithers' mental condition was sufficiently impaired so as to render his guilty plea not knowing. He observed Smithers' superior intellectual function and his communications during pretrial detention and since and concluded that Smithers' abilities are inconsistent with the claim that the guilty plea was not knowing or intelligent. Dr. Burnett found the impact of Smithers' mental condition on the voluntary nature of the guilty plea more difficult to assess. Dr. Burnett concluded:

> In my opinion, the above-discussed conditions of confinement and their apparent psychological effects, together with his report of observing jail staff beat another inmate to death, make it reasonable to assume he might plead guilty to escape those conditions, regardless of whether or not he was guilty of the crimes charged. To the extent to which conditions existed as reported, Mr. Smither's pleas may well have been unduly influenced by those conditions.

Finally, Dr. Burnett considered whether Smithers' mental condition caused the long delay in filing the habeas petition. He observed that PTSD patients commonly exhibit avoidant behavior and that it is plausible that Smithers may have avoided discussing, writing, or testifying about his traumatic experiences even at a significant cost to himself. However, he also noted Smithers' pursuit of a civil lawsuit regarding jail conditions during his pretrial confinement and the substantial and lengthy efforts to overturn his conviction, which reference his time in county jail. Dr. Burnett could not determine the precise extent of Smithers' involvement in preparing filings but noted that some of the filings are in Smithers' handwriting. He concluded, "To the extent that he was emotionally able to complete and/or be involved in these filings, which occurred on and off over an extended period of time, and relate, at least indirectly to the

14

trauma of his pre-trial incarceration, it's not clear why he would not have also been able to file his claim regarding the effects of conditions of confinement on his plea, even if it was then and remains very difficult for him to talk about."

Additional Witnesses

Fernando Griffith also testified on Smithers' behalf. He was held at the Johnson County Jail from May 22, 2000, until he was sentenced in October 2001. He came back to the jail intermittently for court proceedings. He knew Smithers from his assignment to a neighboring cell in HD block, a segregation unit near booking that was isolated from the rest of the jail. He had no access to law library materials and only minimal access to cleaning supplies. Jail staff opened and shut metal doors to annoy inmates and to keep them from sleeping, and he could hear arrestees complaining in the "drunk tank". When he complained, he received no responses from staff. He described himself as "shellshocked" by the jail conditions and that he receives mental health treatment as a result. Most days, he and Smithers had no human contact except for each other. He observed that Smithers found the jail conditions stressful. On cross-examination, Griffith conceded that he had been transferred from the county jail to the Indiana Department of Correction on September 22, 2000, and that he had objected to the transfer. Griffith explained that he objected because he believed that it would affect his ability to communicate with counsel but that he had more access to legal materials at

the State facilities. He returned to the jail on several occasions and met Smithers on one of these occasions in summer or early fall.[4]

Daylon Welliver testified on behalf of the Warden. He worked at the Johnson County Prosecutor's Office for twenty-four years. He was the lead prosecutor for the child molestation case and had substantial involvement in the conspiracy to commit murder case, including the initial investigation and several court appearances. He was primarily responsible for plea negotiations in Smithers' cases, though the high profile of the case necessitated approval from the elected prosecutor. Smithers was in general population during the investigation of the conspiracy to commit murder charge. He had offered a plea deal prior to the conspiracy charge, but plea negotiations were reset thereafter. He had no awareness that jail conditions played a role in plea negotiations. He did not make any threats or promises with respect to jail conditions or transfers to other facilities. He had no preference as to whether Smithers stayed at the county jail or went to a State prison as long as he remained incarcerated.

Sergeant Ryan Bartlett also testified on behalf of the respondent. He worked at the Johnson County Jail from 1996 to March 2001 as a full-time shift supervisor. The county jail was under construction for expansion and renovation. The dayroom in each block had tables, telephones, televisions, and microwaves. Inmates in administrative segregation could go to the commissary, but inmates in disciplinary segregation could

_____

[4] The sole mention of Fernando Griffith in Smithers' jail records is a request, dated April 19, 2001. Hearing Ex. C. at 20. In that request, Smithers was housed in D Block and asked for time out of his cell to consult with Griffith regarding his legal work.

not. No inmates were beaten to death during his time at the county jail. He recalled that the cells near the "drunk tank" were segregation cells. He had no recollection of Smithers.

<u>Medical Records</u>

Because Dr. Burnett did not describe in detail Smithers' more recent mental health treatment, the court does so here. Smithers began receiving sporadic mental health treatment again starting in 2015. On February 10, 2015, a mental health professional saw Smithers because he had requested to speak to someone about post-traumatic stress disorder. Hearing Ex. K at 78-79. Smithers reported struggling with anxiety, depression, and post-traumatic stress disorder relating to his time in restrictive housing at the county jail. *Id.* She sent Smithers information on depression and anxiety. *Id.* On February 23, 2015, Smithers reported that he did not find the information helpful. *Id.* at 75-76. He again attributed post-traumatic stress disorder to "being in restrictive housing during his sentencing at the county jail." *Id.* On April 8, 2015, the mental health professional observed a lack of symptomology despite Smithers' continued reports of struggling with post-traumatic stress disorder. *Id.* at 71-72. She observed that Smithers continued to report that he did not commit the crimes for which he was convicted. *Id.*

On April 20, 2016, Smithers had a mental health appointment as a consequence of his placement in restrictive housing. *Id.* at 69-70. The mental health professional assessed moderate depression and severe anxiety. *Id.* Smithers reports that he began experiencing these symptoms when his cat was confiscated due to his move to restrictive housing. *Id.* On May 20, 2016, Smithers reported high levels of stress due his

time in restrictive housing. *Id.* at 60-61. He reported that he had post-traumatic stress disorder and that the lack of family contact, the absence of his cat, and his physical condition caused him stress. *Id.* He reported that he did not want mental health services but agreed to submit a healthcare request if he needed them in the future. *Id.*

On October 24, 2018, Smithers had a mental health appointment as a consequence of his return to restrictive housing. *Id.* at 52-53. He reported spending two years in solitary confinement in jail and that he struggled with confinement in cells. *Id.* He also reported frustration with losing his job. *Id.* The mental health professional described Smithers as mildly anxious but without indications of functional impairment. *Id.* On November 21, 2018, Smithers reported increased anxiety and stress due to his placement in restrictive housing. *Id.* at 50-51. He also reported difficulty falling asleep and hearing voices. *Id.* He discussed his placement in a strip cell at the county jail for about two years and that, as a result, he felt tortured to plead guilty in his case. *Id.*

On January 2, 2019, he asked for treatment for post-traumatic stress disorder. *Id.* at 48-49. The mental health professional described Smithers as irritable and frustrated and observed that Smithers discontinued mental health treatment following his prior release from restrictive housing. *Id.* On February 28, 2019, Smithers reported anxiety, disruptive memories from prior incarceration, and panic attacks triggered by loud noises. *Id.* at 46-47. He reported racing thoughts and regularly waking up covered in sweat. *Id.* The mental health professional consulted with a psychologist, who diagnosed post-traumatic stress disorder, and referred him to a psychiatrist for medical evaluation. *Id.*

On March 21, 2019,[5] Smithers reported minor depression, anxiety, panic attacks, nightmares, hypervigilance, and flashbacks. *Id.* at 41-45. He reported being stabbed in 2000 and that he experienced auditory hallucinations during panic attacks. *Id.* The psychiatrist diagnosed post-traumatic stress disorder and prescribed Cymbalta for anxiety. *Id.* The psychiatrist found that Smithers did not satisfy the criteria for panic disorder and that the auditory hallucinations appeared to be internal monologue. *Id.* On April 18, 2019, Smithers reported that Cymbalta did not alleviate his anxiety and that he could not manage post-traumatic stress disorder. *Id.* at 38-39. He described his previous place of incarceration as torture and aspired to return to his job as a music instructor. *Id.*

On June 10, 2019, Smithers reported that he spent two years in a sensory deprivation cell while in county jail until he pled guilty and that he has had post-traumatic stress disorder since that time. *Id.* at 35-6. He reported hearing voices and that no medication had effectively treated his post-traumatic stress disorder. *Id.* The mental health professional referred him to a psychiatrist. *Id.* On June 20, 2019, Smithers reported post-traumatic stress disorder but no depression and represented that he did not want psychotropic medication. *Id.* at 32-33. On July 1, 2019, Smithers reported auditory hallucinations and intense anxiety because he was left in segregation "at another prison for months to years until he signed a plea." *Id.* at 30-31. On July 23, 2019, Smithers continued to report auditory hallucinations during panic attacks and that a lack of stimulation worsened his symptoms. *Id.* at 27-28. He attributed his post-

---

[5] It appears that Smithers had been released from restrictive housing around this time as the medical records omit any mention of restrictive housing beginning on this date.

traumatic stress disorder to "a long seclusion that he endured in a county jail where he suffered sensory deprivation." *Id.* The mental health professional observed no apparent responses to internal stimuli. *Id.*

On August 12, 2019, Smithers reported being "in crisis mode" with post-traumatic stress disorder and described spending two years of sensory deprivation at the county jail until he pled guilty. *Id.* at 24-26. He reported concerns that his fellow inmates had a renewed interest in harassing child sex offenders. *Id.*

On August 23, 2019, Smithers reported auditory hallucinations. The mental health professional described Smithers as "increasing[ly] anxious and wringing his hands and moving back and forth" as he discussed post-traumatic stress disorder. *Id.* at 21-23. "He indicated that it is difficult to think about or talk about the 2 years he spent in solitary confinement pre-trial and how he feels that he was basically forced to accept a plea or stay in solitary." *Id.* The mental health professional observed rapid, pressured speech, quickened breath, and tangential thinking, and ended the session. *Id.*

On August 28, 2019, Smithers presented as anxious with rapid speech and thoughts. *Id.* at 18-20. He reported disordered thinking and that he experienced trauma and flashbacks each time he tried to work on his case. *Id.* The mental health professional observed, "Each time he has talked to me about [the details of his experience in solitary confinement], he becomes very anxiety ridden and almost panicked that I am not understanding him." *Id.* On September 11, 2019, Smithers met with a psychiatrist for medication trials. *Id.* at 14-17. On October 18, 2019, Smithers reported panic attacks, anxiety, and triggers for post-traumatic stress disorder. *Id.* at 11-13. The psychiatrist

described his report as "vague as last time but not dismissible." *Id.* On October 24, 2019, Smither met with a mental health professional for the purposes of obtaining medical evidence for a lawsuit showing that "his trigger for his PTSD is revisiting his pretrial detainment and his criminal case."[6] *Id.* at 8-10. On November 27, 2019, a psychiatrist prescribed a trial run on Zyprexa. *Id.* at 5-7. On February 6, 2020, Smithers reported that he had received three conduct reports for not attending mental therapy appointments, which he attributed to not receiving notice and the emotional inability to leave his cell. *Id.* at 2-4. He felt that his prior therapist "was policing [him] and that [he] cannot open up to someone who is like a cop." *Id.* He discussed "being locked in a small metal cell in Johnson County Jail for 2 years after his arrest." *Id.* The mental health professional described him as fidgety, nervous, and anxious. *Id.*

<u>Procedural Issues</u>

The Warden argues that the court cannot consider the evidence presented at the evidentiary hearing under 28 U.S.C. § 2254(e)(2).[7] That provision reads:

---

[6] Here, Smithers appears to reference this habeas case. On July 30, 2019, the court denied Smithers' request for appointed counsel in which he explained that his post-traumatic stress disorder prevented him from preparing a traverse. ECF 15. However, the court invited him to submit a new request if he could support his allegations with medical evidence. On January 15, 2020, Smithers renewed his request with the medical record dated August 23, 2019, as described in this section, which the court granted. ECF 20, ECF 21.

[7] The Warden also relies on *Shoop v. Twyford*, 142 S. Ct. 2037 (2022), in which a district court granted an order transporting the habeas petitioner to facility for a medical examination without first considering "whether it would be able to consider the evidence that Twyford hoped to develop." According to the Warden, the salient point from *Shoop* is that "A court therefore must, consistent with AEDPA, determine at the outset whether the new evidence sought could be lawfully considered." *Id.* at 244. But this case is distinguishable because, in granting the evidentiary hearing, the court determined that it might be able to consider the evidence described by Smithers to resolve the substantive claim, though the manner in which the procedural issues dovetail with the substantive claim rendered it a conditional determination. ECF 50.

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A) the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The facts underlying Smithers' involuntary plea claim do not suggest his innocence as to the underlying offense. Therefore, the salient question is whether Smithers bears responsibility for the failure to develop the State court record as to the involuntary plea claim. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) ("We interpret 'fail'. . . to mean that the prisoner must be 'at fault' for the undeveloped record in state court. A prisoner is 'at fault' if he 'bears responsibility for the failure' to develop the record."). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. "[O]nly a prisoner who has neglected his rights in state court need satisfy [the Section 2254(e)(2)] conditions." *Id.*

22

Though the Warden characterizes this issue as a threshold issue, it dovetails with the other procedural issues in this case regarding timeliness and procedural default. Specifically, Smithers argues that the court should excuse the untimely nature of his claim under the equitable tolling doctrine because his mental condition prevented him from filing a habeas petition sooner. "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010). Petitioners must show reasonable diligence in pursuing their rights throughout the federal limitations period and until the date the habeas petition is filed. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016). "It is the petitioner's burden to establish both of these points." *Socha v. Boughton*, 763 F.3d 674, 683 (7th Cir. 2014). "Although not a chimera—something that exists only in the imagination, equitable tolling is an extraordinary remedy that is rarely granted." *Carpenter*, 840 F.3d at 870.

Smithers also argues that the court should excuse the procedural default because the conditions at the Johnson County Jail caused him to develop a mental condition that prevented him from presenting the underlying claim on post-conviction review. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor

external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

The medical evidence is ambiguous as to whether the conditions at the Johnson County Jail had a lasting effect of Smithers' mental health. The mental health evaluation conducted near the end of his time at the jail concluded, "[Smithers] has very few psychiatric symptoms and is anxious because he has charges pending." Hearing Ex. C. at 61-62. Psychiatric evaluations from November 27, 2002, and from February 13, 2003, do not mention jail conditions or post-traumatic stress disorder. Hearing Ex. K at 104-07. Medical staff at the IDOC diagnosed him with post-traumatic stress disorder at the outset but had declared him free of mental illness by 2010. The medical records contain no indication that Smithers sought or received any mental health treatment from March 15, 2006, to January 29, 2015. He regained the post-traumatic stress disorder diagnosis in February 2019 after reporting symptoms for four years, but some medical professionals continued to express skepticism regarding these reports.

Smithers' litigation history is also material to the inquiry of whether his mental health affected his ability to raise and to factually develop the involuntary plea claim. On April 7, 2003, Smithers filed a civil rights lawsuit in the United States District Court for the Southern District of Indiana, *Smithers v. Johnson County Jail*, 1:03-CV-399, Hearing Ex. G. In this complaint, he alleged that the Johnson County Jail failed to provide an adequate law library and further failed to provide him adequate mental health care, and he attached appropriate exhibits. *Id.*; Hearing Ex. H. Though he did not prevail, he responded to the defendants' motion for summary judgment and received a judgment

on the merits.[8] He filed a motion to reconsider the summary judgment order and initiated an appeal, though it was summarily dismissed on June 14, 2004, for failure to pay the appellate filing fee.

In Smithers' testimony, he mentioned that he used a complaint for a prior lawsuit to draft the complaint for 1:03-CV-399 but that the prior lawsuit was dismissed due to his inadequate access to the law library at the Johnson County Jail. It appears that this prior lawsuit is *Smithers v. Richards*, 1:01-CV-680 (S.D. Ind. filed May 15, 2001). This case was dismissed without prejudice for failure to exhaust administrative remedies, and Smithers attempted to appeal this case until December 19, 2002, when it was dismissed for failure to pay the appellate filing fee.[9]

Next, on June 20, 2011, Smithers filed a petition for post-conviction relief, alleging as follows:

> (a) In violation of the Sixth Amendment right to effective assistance of counsel, trial counsel failed to investigate the existence of exculpatory evidence, to wit; confessions of Agent of State that Petitioner was entrapped.

> (b) In violation of the Sixth Amendment right to effective assistance of counsel, trial counsel did not accurately portray the penological consequences of the guilty plea.

> (c) During plea negotiations, the State threatened Petitioner with additional charges that could not result in convictions and led Petitioner to believe he could be convicted of the additional charges rendering the plea illusory.

---

[8] Pursuant to Fed. R. Evid. 201, the court takes judicial notice of the electronic docket for the United States District Court for the Southern District of Indiana.

[9] Though immaterial to this analysis, the court further observes that, in February 2004, Smithers initiated efforts to pursue a belated direct appeal as a pro se litigant, though he was appointed counsel to pursue this appeal.

(d) The trial court failed to adequately advise Petitioner of fundamental rights being waived by pleading guilty.

(e) In violation of the Fourteenth Amendment right of due process, the State did not disclose exculpatory evidence: to wit, confession by Agent of State that Petitioner was entrapped.

PCR Appeal App. 24-28. Smithers remained pro se until the Indiana Supreme Court denied his petition to transfer on December 7, 2012. ECF 11-5. Additionally, on December 27, 2018, Smithers, as a pro se litigant, filed the petition initiating this habeas case. ECF 1.

The court further considers Smithers' testimony that he received assistance from other inmates with each of these legal endeavors. Smithers has only vaguely described the manner of assistance from other inmates. He seems no less capable than other pro se litigants in reading, writing, requesting appropriate forms, or sending mail, so the court understands the alleged assistance as assistance with articulating claims and allegations regarding the conditions of the Johnson County Jail. Consistent with Dr. Burnett's testimony, the complaint in 1:03-CV-399 and the habeas petition are both handwritten in a similar style and include facts that appear to be derived from Smithers' personal knowledge. For example, the complaint in 1:03-CV-399 contains a handwritten description of the law library and legal resources available at the Johnson County Jail. Hearing Ex. G. The habeas petition similarly contains the handwritten allegations describing the jail conditions on which he now proceeds. ECF 1 at 4. Consequently, it does not appear that other inmates meaningfully assisted Smithers with drafting the allegations relating to the jail conditions in these cases.

While the post-conviction filings are typed, they, too, include facts that appear to be derived from Smithers' personal knowledge. For example, Smithers described his relationship with Wombles as follows.

> After 3 weeks of preparation in 2001, [Wombles] entrapped [Smithers] into a Conspiracy to Commit Murder scam. Unable to make bond from the county jail, Wombles made a deal with the State to cooperate in what they thought was an ongoing murder for hire being sought by [Smithers]. In exchange for release from jail on his own recognizance, Wombles wore a listening device to capture [Smithers] speaking about the murder for hire plot.
>
> What the State did not know was that Wombles had been grooming [Smithers] for weeks to develop a line of discussion that was pure nonsense and was solely designed to cloud the context of a recording. At first, plans to rob banks, carjack vehicles, and plots to assassinate the President were discussed with such a manic effort that [Smithers] paid little attention to Wombles when he broached the idea of killing the [victim of his crime of child molestation and her family]. [Smithers] played along just like he had done for the weeks prior so as not to upset Wombles who would become violent when [Smithers] didn't show interest in his rants. This radical behavior even included elaborate diagrams, lists, and the scribbling of crude maps on napkins. [Smithers] did not for a minute believe that Wombles had any intention of actually carrying out the fictional plan. The recorded conversations were just one in a series of fantastic nonsense conversations with a career criminal who was more than willing to sacrifice [Smithers].

ECF 11-6 at 6; *see also* PCR Appeal App. 39.

The post-conviction record also reveals that Smithers sought to subpoena numerous witnesses, including trial counsel and Codell Wombles, but that he did not seek appointed counsel.[10] PCR Appeal App. 30-52. To the contrary, in the post-conviction petition, Smithers affirmatively indicated that he did not want

---

[10] Pursuant to Fed. R. Evid. 201, the court takes judicial notice of the electronic dockets for the Indiana courts, which are available at https://public.courts.in.gov/mycase/.

representation from a public defender. *Id.* at 27. He also advocated for an evidentiary

hearing. *Id.* at 50. Thus, while these subpoenas were denied, it appears that Smithers

intended to personally examine these witnesses himself at an evidentiary hearing. And

given the nature of his claims, it seems likely that Smithers intended to personally elicit

some testimony regarding the conditions of the Johnson County Jail from trial counsel

and Codell Wombles.

The court's reasoning largely tracks Dr. Burnett's assessment that it was unclear

why Smithers could not have filed the habeas petition sooner given his litigation

history. Taken together, the record reflects that, as a pro se litigant, Smithers initiated

cases relating to the conditions of his confinement at the Johnson County Jail on four

separate occasions in 2001, 2003, 2011, and 2018. Given these filings, it is unclear why

Smithers could not have added his pending involuntary plea claim to the post-

conviction petition in 2011 or in a habeas petition when it would have been timely prior

to January 2008. Further, the court cannot find that Smithers acted diligently to factually

develop a claim that he omitted from the post-conviction petition. *See Schriro v.

Landrigan*, 550 U.S. 465, 479 (2007) (finding that failure to present a claim in State court

was a failure to develop a claim in State court). Additionally, even if Smithers required

assistance from others to prepare the habeas petition, there is no indication that he acted

diligently to obtain such assistance prior to 2018. Moreover, as detailed below, the court

cannot credit Smithers' narrative regarding the jail conditions and thus cannot find that

jail conditions prevented him from asserting the pending involuntary plea claim in the

post-conviction petition.

Consequently, the court finds that Smithers failed to factually develop the involuntary plea claim in State court. The court finds that Smithers has not demonstrated an extraordinary circumstance that prevented him from filing a timely habeas petition. The court further finds that Smithers has not demonstrated cause-and-prejudice for procedurally defaulting the involuntary plea claim in State court. Therefore, the claim is denied because it is untimely and procedurally defaulted.

## Involuntary Plea

Notwithstanding these procedural rulings, the court will, for the sake of completeness, consider Smithers' underlying habeas claim in light of the evidence presented at the hearing. Given that the evidentiary hearing has already occurred, the court perceives no prejudice to the Warden by considering this evidence.

Smithers argues that he is entitled to habeas relief because his guilty plea was involuntary due to the conditions of his confinement in segregation at the Johnson County Jail. On the jail conditions, Smithers specifically alleged:

> Petitioner was subjected to pretrial detainment that seriously damaged his mental and physical health. Petitioner was housed in a segregation cell with no access to radio, TV, books, magazines, recreation, law library, or clocks and had almost no human contact. His fast & speedy trial request was waived without his presence or consent and subsequent pretrial hearings/continuances were held without his presence. Petitioner was housed in this manner for 22 months, and he truly believed he would die before a trial could be held.

ECF 1 at 4.

Because a defendant waives many constitutional rights by pleading guilty, due process requires that a guilty plea must be entered knowingly and voluntarily with the

29

advice of competent counsel. *United States v. Kelly*, 337 F.3d 897, 904 (7th Cir. 2003)

(citing *Brady v. United States*, 397 U.S. 742, 748 (1970)). "The standard . . . remains

whether the plea represents a voluntary and intelligent choice among the alternative

courses of action open to the defendant." *Id.* "A plea is voluntary when it is not induced

by threats or misrepresentations, and the defendant is made aware of the direct

consequences of the plea." *Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002).

In resolving this claim, the court assumes without deciding that the jail conditions

alleged by Smithers amounted to a threat capable of rendering his guilty plea

involuntary. Instead the court will focus on whether the record, including evidence

from the hearing, adequately supports the allegations regarding the jail conditions.

The jail records largely contradict Smithers' allegations regarding the jail

conditions. The hearing testimony established that the segregation units were labeled

Unit D and HD. The jail records spanning sixty-three pages are illustrative, if not

comprehensive, consisting largely of requests and grievances written by Smithers.

Hearing Ex. C. The earliest record dates from December 22, 2000, in which Smithers

asked to be placed in administrative segregation because he feared that he would be

harmed given the nature of his child molestation charge. *Id.* at 57. The records reflect

that he remained in D Unit from at least March 16, 2001, to July 18, 2001. *See e.g., id.* at 3-

4, 14, 49. They reflect that he had been moved to general population in C Unit as of

August 25, 2001. *Id.* at 13. On August 31, 2001, the prosecution charged Smithers with

conspiracy to commit murder. From at least September 5, 2001, to November 22, 2001,

he was housed in HD Unit. *See e.g., id.* at 11, 63. From at least February 19, 2002, through

June 27, 2002, Smithers was housed in general population primarily in L Unit with brief stints in N unit and I unit. *See, e.g., id.* at 28, 34, 37, 55. On June 21, 2002, Smithers moved to D Unit as a disciplinary sanction for threatening another inmate. *Id.* at 50, 54. On September 4, 2002, Smithers submitted a request to return to I Unit, which was granted. *Id.* at 39.

Smithers remained in I Unit until November 20, 2002, when the trial court granted his request to transfer to an IDOC facility for safekeeping. *See e.g., id.* at 44, 46. At this hearing, the following interaction occurred:

> **Trial Counsel:** Due to the nature of the offense to which Mr. Smithers is pleading to today, he has asked me if he could be sent to [the Department of Correction] for safekeeping. He's under the impression that his case has drawn some news attention, some news publicity, and the nature of the charge to which he is pleading guilty today, he feels may jeopardize somewhat of his relations in his particular cell block with other inmates, and he feels that if he was at DOC for safekeeping his safety would be better served. If we could make that request of the Court.

> **The Court:** Okay, and he hasn't been at safekeeping before?

> **Trial Counsel:** He's been in general population, but most of the general population that he's in with now, he's been in for a year and most of the general population he's been in with doesn't know the nature of the charges that he's with as his case hasn't drawn any attention in the past six or seven months at least of significant value. But he does have a variety of individuals in his cell block that he feels may create a problem for him.

Plea Tr. 3-4. On that day, Smithers pled guilty to the charge of conspiracy to commit murder after advising the trial court that no person or governmental agency had made any promise to him beyond what was in the plea agreement in exchange for his guilty plea. *Id.* at 6-9. On December 5, 2002, following his transfer to a IDOC facility, Smithers similarly pled guilty to the charge of child molestation. *Id.* at 16-20.

The docket sheets for the child molestation conviction and the conspiracy conviction indicate that Smithers appeared in court fourteen times during his time at the Johnson County Jail, including times when he resided in D Unit and HD Unit. The jail records further indicate as follows:

- On April 14, 2001, while in D Unit, Smithers requested court rules, judicial opinions, and legal treatises, which jail staff granted. Hearing Ex. C at 5.

- On April 15, 2001, while in D Unit, Smithers requested the release of tax documents and tax books to his mother, which jail staff granted. *Id.* at 10.

- On April 19, 2001, while in D Unit, Smithers asked to spend time in the dayroom to conduct legal research with Inmate Griffith, who he described as his "research assistant and prospective co-counsel," which jail staff denied. *Id.* at 20.

- On April 23, 2001, while in D Unit, Smithers requested judicial opinions and legal treatises, which jail staff granted. *Id.* at 18.

- On April 28, 2001, while in D Unit, Smithers requested copies of legal documents, which jail staff granted. *Id.* at 19.

- On May 4, 2001, while in D Unit, Smithers requested judicial opinions and statute, which jail staff granted. *Id.* at 4.

- On May 6, 2001, while in D Unit, Smithers requested the release of an envelope and legal papers to his mother, which jail staff granted. *Id.* at 9.

- On May 18, 2001, while in D Unit, Smithers requested permission to possess a wedding band, rosary, or cross. Jail staff responded that the wedding band was permissible. *Id.* at 2.

- On July 11, 2001, Smithers asked why he no longer received his newspaper subscription, and jail staff responded that they could only pass out mail that they receive. *Id.* at 17.

- On July 14, 2001, while in D Unit, Smithers requested the release of legal documents to his mother, which jail staff granted. *Id.* at 15.

- On July 18, 2001, while in D Unit, Smithers asked for clarification on whether he could possess hardback books, but jail staff responded that he could only possess paperback books. *Id.* at 14.

- On September 5, 2001, while in HD unit, Smithers requested permission for inmates in HD Unit to go to the commissary because they had been skipped in the regular rotation, which jail staff granted. *Id.* at 11.

- On November 22, 2001, while in HD Unit, Smithers asked for permission for the inmates in HD Unit to go to L Unit to watch television on the Thanksgiving holiday, which jail staff denied. *Id.* at 63.

- On February 23, 2002, while in L unit, Smithers asked to use a different telephone due to technical difficulties that arose when his mother had changed her telephone number, which jail staff granted. *Id.* at 28.

- On March 13, 2002, while in L Unit, Smithers asked to call his father because his father was moving away, which jail staff granted. *Id.* at 35.

- On March 20, 2002, while in L Unit, Smithers asked to go to the commissary because he had missed a prior opportunity due to a court appearance, which jail staff denied. *Id.* at 32.

- On March 22, 2002, while in L Unit, Smithers asked to call his father to follow up on correspondence that he believed his father had sent him, which jail staff granted. *Id.* at 30.

- On April 3, 2002, while in L Unit, Smithers asked to go to the commissary because he had recently received money, which jail staff granted. *Id.* at 31.

- On July 27, 2002, while in D Unit, Smithers asked to go to the law library, which jail staff granted. *Id.* at 55.

- On July 31, 2002, while in D Unit, Smithers requested the release of legal documents to his mother, which jail staff granted. *Id.* at 36.

- On June 16, 2002, while in I Unit, Smithers requested the release of a paperback novel to his mother, which jail staff granted. *Id.* at 37.

- On August 13, 2002, while in D Unit, Smithers requested the release of legal documents to his mother, which jail staff granted. *Id.* at 38.

33

- On August 15, 2002, while in D Unit, Smithers submitted a grievance complaining that he had not been served vegetarian meals, which jail staff referred to the kitchen matron. *Id.* at 41.

- On August 23, 2002, while in D Unit, Smithers requested copies of legal documents, which jail staff granted. *Id.* at 40.

Though incomplete, the jail records broadly suggest that Smithers spent nearly all of 2001 in segregation but spent nearly all of 2002 in general population. The jail records do not expressly explain why Smithers was placed in segregation in 2001, but the only plausible reasons within the record are that Smithers requested administrative segregation in December 2000 due to his fear of other inmates and that jail staff discovered that Smithers had been charged with conspiring with his cellmate to murder his child molestation victim while in general population in September 2001. His numerous requests for legal authority and copies of legal documents as well as one request to go to the law library demonstrate that he had reasonable access to the law library even while in segregation. He also asked to release legal documents to his mother on numerous occasions, which suggests that he was able to coordinate with his mother to pick them up, which, in turn, suggests that he had means of communicating with her even while in segregation. His requests for a newspaper and hardback book further reflect that newspapers and books were not prohibited in segregation, even if jail staff denied these particular requests. Similarly, his request for the inmates in HD Unit to go to the commissary because they had been skipped in the regular commissary rotation indicates that he had regular access to the commissary while in segregation.

And his request for time with Inmate Griffith, whom he described in familiar terms, indicates some ability to speak with other inmates while in segregation.

The focus of Smithers' more miscellaneous grievances and requests is also at odds with his representations describing abject misery. While in segregation, Smithers asked for his wedding band, permission to celebrate Thanksgiving in another housing unit, and his vegetarian diet. The court does not seek to downplay the valid and understandable concerns posed by these requests, but these relatively minor concerns are largely inconsistent with the severity of Smithers' allegations in this case. Indeed, the jail records do not contain any grievances strictly relating to his placement in or the conditions of segregation or its deteriorating effect on his mental health. And, though Smithers testified that he believed that grieving his segregation placement would be futile, the jail records suggest that jail staff addressed a significant number of Smithers' concerns, including his request to be placed in administrative segregation in December 2000 and his request to be removed from segregation in September 2002. By contrast, the record unequivocally demonstrates that Smithers had concerns about remaining in general population at the Johnson County Jail at the outset of his pretrial detention and immediately prior to his transfer to an IDOC facility.

In sum, the jail records fatally undermine Smithers' representations regarding his conditions of confinement at the Johnson County Jail. They reflect that Smithers did not spend substantially all his time in segregation. They reflect that, even while in segregation, Smithers had access to the law library, physical and mail access to the courts, the ability to speak with other inmates, the ability to communicate with his

family, access to the commissary, and access to books and newspapers. They reflect no

mental decomposition as a result of the jail conditions. They even suggest that Smithers

may have been more concerned with remaining in general population than placement

in segregation.

Smithers' period of detainment at the Johnson County Jail was no doubt

unpleasant. However, the record as a whole does not indicate it was abnormally

unpleasant to the degree that it would render a guilty plea involuntary. Nor does the

record indicate that Smithers "truly believed he would die before a trial could be held"

or that he pled guilty for the purpose of escaping placement in segregation. Because

Smithers has not satisfied his burden of proving his allegations regarding the jail

conditions, the underlying claim is not a basis for habeas relief. And because the court

denied Smithers' other habeas claims in a separate, prior order, the habeas petition is

denied.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must consider

whether to grant or deny a certificate of appealability. To obtain a certificate of

appealability when the court dismisses a petition on procedural grounds, the petitioner

must show that reasonable jurists would find it debatable (1) whether the court was

correct in its procedural ruling and (2) whether the petition states a valid claim for

denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, there is

no basis for finding that jurists of reason would debate the correctness of this

procedural ruling, so there is no basis for encouraging Smithers to proceed further in federal court.

For these reasons, the court:

(1) DISMISSES the petition (ECF 1) because the claims are untimely, procedurally defaulted, and meritless;

(2) DENIES David Smithers, a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(3) DIRECTS the clerk to close this case.

SO ORDERED on October 26, 2023

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT